IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IRIS CHAMBERS and LAMAR DeSHIELDS,** | : | **Civil No. 1:18-cv-2386** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **YORK COUNTY PRISON,** | : | |
| | : | |
| **Defendant.** | : | **Judge Sylvia H. Rambo** |

**M E M O R A N D U M**

Before the court is Defendant York County Prison's ("YCP") Motion for Summary Judgment challenging the adequacy of race-based hostile work environment claims asserted by two of its correction officers pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 ("PHRA"). (Doc. 36.) For the reasons set forth below, the motion will be denied.

I.     **BACKGROUND**

On December 17, 2018, Plaintiffs Iris Chambers and Lamar DeShields sued Defendant York County Prison for employment discrimination under multiple legal theories. At the time, both were employees of YCP for over a decade, having operated primarily as officers monitoring inmates. Plaintiffs are both African American United States citizens who met and married while working for Defendant. They have brought several claims in this case alleging that their years working for

1

Defendant involved a hostile work environment stemming from a racist culture that YCP's upper-level policymakers have either known about and refused to correct or themselves participated in.

Mrs. Chambers is the primary Plaintiff in this case.  Mrs. Chambers has introduced evidence suggesting that her coworkers generally treated her as if she was a dangerous, vain, and undisciplined worker, based not on her actually engaging in any such conduct, but due to her being a black woman.  (*See generally* Doc. 43, ¶ 11(c).)[1]   For example, Mrs. Chambers testified that her coworkers mocked her for her appearance, particularly making jokes about how she needed to go to the store to buy 'weave,' toilet paper, and lipstick.  (*See* Doc. 43, ¶ 11(j); *see also* Doc. 43, ¶¶ 11(d), 11(i) (coworker Denise Morales corroborating that Mrs. Chambers was mocked by coworkers for her hair).)  She also testified that she reported her colleagues' behavior on multiple occasions, but that her complaints were dismissed without serious investigation.  (*See* Doc. 43, ¶ 11(g).)

In addition, Mrs. Chambers testified that one of her supervisors made discriminatory remarks about her, including by telling another colleague to "write the nigger up," and by bragging that he would never be removed from YCP,

---

[1]      The court frequently cites Plaintiff's statement of facts for the sake of brevity.  The court, however, has independently reviewed the evidence at issue and found it supports the factual claims relied upon in this memorandum.

regardless of his conduct, because his family was well-established there.[2]  (*See* Doc.

43-12, pp. 12-16 of 16; Doc. 43, ¶ 12(e); Doc. 37-1, 188:19-189:15.) She also claims

that she was questioned about whether her bags at work were full of fried chicken

and watermelon, and that her white colleagues refused to use her real name and

instead referred to her as "angry black woman." (*See* Doc. 43, ¶ 11(a) & (f).)  In

addition to making such remarks, Mrs. Chambers claims that her white colleagues

also generally bullied her, including by intentionally locking her inside various

buildings, and by assigning her fewer desirable duties as compared with her white

coworkers. (*Id.*, ¶ 11(c)-(d).)   Mrs. Chambers asserts that she regularly filed

complaints on such matters to encourage her supervisors to intervene, but that she

"never heard anything back".  (*See, e.g., id.*, ¶¶ 11(d), 11(j); Doc. 37-1, 128:9-11;

---

[2]      Defendant raises a general objection that all of Plaintiffs' evidence—including Officer
Cuffaro's statement—is "based on nothing more than inadmissible rumor, speculation, and
hearsay." (Doc. 45, p. 7 of 26 (capitalization omitted); *accord id.* at p. 8 of 26 ("Plaintiffs cannot
support their case with anything but rumor, speculation, and—perhaps most notably—hearsay.").)
While summary judgment is generally subject to the rules of evidence, "general objections, such
as characterizing the evidence as [hearsay], will not suffice" to raise a proper evidentiary objection.
*United States v. Sandini*, 803 F.2d 123, 126 (3d Cir. 1986); *accord Meals v. Port Auth. Trans
Hudson Corp.*, 622 F. App'x 121, 124-25 (3d Cir. 2015) (holding appellant waived evidentiary
objections by not raising them regarding the specific area of testimony at issue).  Thus, the court
will only address Defendant's specific evidentiary objections.
         As to Officer Cuffaro's statement, Defendant objects that it is inadmissible hearsay by Mrs.
Chambers.  The daily reports at issue, however, are recorded documentary evidence of this event
and Plaintiffs point to multiple people who directly heard the statement and could testify to it at
trial. *See Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016)
(internal brackets, quotations, and emphasis omitted) ("The rule in this circuit is that hearsay
statements can be considered on a motion for summary judgment if they are capable of being
admissible at trial

*see also* Doc. 43, ¶¶ 11(d), 11(j).) [3]   A review of Mrs. Chambers' deposition also reveals several references to daily reports she filed containing complaints about racist conduct by coworkers.[4]   (*See generally*, Doc. 37-1.)

Turning to Mr. DeShields, he complains of being similarly subjected to racist treatment and bullying, as well as witnessing racist treatment of prisoners and coworkers.   For example, Mr. DeShields testified that officers harassed him by engaging in clique-like group insults, including by insulting him for his clothing, by calling him a "piece of shit," by making fun of the fact that the palms of his hands are much lighter than his black skin, and by laughing at him.   (Doc. 43, ¶ 22 (c).) He also states that he was repeatedly given worse work assignments as compared to his white colleagues, such as being stationed outside during bad weather.   (*Id.*, ¶ 11(c).)   Like Mrs. Chambers, Mr. DeShields complained to YCP about suffering from discrimination based on race. (*Id.*, ¶¶ 11(c), (j), 12(a), 12(c).)

---

[3]   Defendant has elicited some testimony from Mrs. Chambers showing she did receive some apologies and she was willing to work anywhere in the prison.  Plaintiffs argue this was an insufficient level of intervention to alter the culture at the prison and that Mrs. Chambers was still forced to work in poorer environments more frequently than her white coworkers.

[4]   Mrs. Chambers also testified that a coworker "made a threat against me . . . In front of inmates she said I need to die," and that an inmate overheard the remark. (Doc. 37-1, 206:16-20.) Defendant objects that this testimony is hearsay within hearsay because Mrs. Chambers is relaying a statement made by an inmate about another statement allegedly made by the coworker.  Because Plaintiffs do not respond to this argument, and since it raises a colorable issue with the admissibility Mrs. Chambers' testimony, the court will grant this objection and exclude from consideration, at the summary judgment stage, evidence of the alleged threat against Mrs. Chambers.

Mr. DeShields also testified that one white coworker said in his presence that Mexicans need to be murdered and that black people should not be allowed in this country. (*Id.*, ¶ 22(a).)  Mr. Deshields claims that he complained about the remarks to YCP, but the colleague later bragged about his lack of punishment. (*Id.*) According to Mr. DeShields, black employees were punished for much less serious offenses, including one colleague that was suspended indefinitely for drawing a picture of genitalia. (*Id.*)

On May 14, 2018, Mrs. Chambers filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that she was subjected to bullying and discriminatory comments from coworkers and that she reported the remarks to her supervisors. (Doc. 12-1.)  On May 14, 2018, Mr. DeShields filed a complaint with the EEOC similarly alleging, among other things, that he was subjected to discriminatory comments, bullying, and exposure to racist imagery. (Doc. 12-2.)

On December 17, 2018, Plaintiffs initiated this action against Defendants, asserting four causes of action: (1) discrimination and retaliation claims under 42 U.S.C. § 2000, *et seq.*, Title VII of the Civil Rights Act of 1964; (2) a 42 U.S.C. § 1983 violation; (3) a "Civil Rights Conspiracy" claim; and (4) a claim for violation of the Pennsylvania Human Relations Act ("PHRA").  (Doc. 1.)

On February 26, 2019, Defendants filed a motion to dismiss for failure to state a claim. (Doc. 5.)  On April 2, 2019, Plaintiff filed an amended complaint, adding new facts and replacing the conspiracy claim with a 42 U.S.C. § 1981 claim. (Doc. 9.)  In response, Defendants filed a new motion to dismiss one week later. (Doc. 11.)

On October 21, 2019, the court granted the motion in part. The court dismissed, with prejudice, Plaintiffs' failure to promote claims, Section 1981 claims, and claims against Defendants in their individual capacity, leaving YCP as the only Defendant.  The court also dismissed Mr. DeShields' retaliation claim without prejudice, and Plaintiff elected not to file an amended complaint. Plaintiffs thus have four remaining claims against Defendant, including a Title VII hostile work environment claim on behalf of both Plaintiffs; a Title VII retaliation claim on behalf of Mrs. Chambers; a PHRA claim, based on the same theory of liability as Plaintiffs' Title VII claims, on behalf of both Plaintiffs; and a Section 1983 claim on behalf of both Plaintiffs.

On April 3, 2020, Defendant filed a motion for summary judgment, arguing that it is entitled to judgment as a matter of law because: 1) Plaintiffs have presented insufficient evidence of discriminatory intent on YCP's part; 2) Plaintiffs' experiences were not severe or pervasive enough to constitute a hostile work environment as a matter of law; 3) Plaintiffs' § 1983 claim fails because there is no

evidence that YCP engaged in a policy or custom of discrimination; and 4) Mrs. Chambers' retaliation claim should be dismissed because she has not suffered an adverse employment action.[5] (*See* Docs. 36-38.)  On April 30, 2020, Plaintiffs filed their opposition brief, which argues they have proffered sufficient evidence to satisfy all necessary elements for their claims, and additionally that Mrs. Chambers was recently terminated by YCP in retaliation for this litigation.  (*See* Docs. 43, 43-1, 44.)

On May 14, 2020, Defendant submitted a reply brief responding to Plaintiffs' arguments, objecting to various pieces of evidence, and arguing that Mrs. Chambers' wrongful termination claim fails for various substantive reasons and because she failed to exhaust her administrative remedies with the EEOC.  (Doc. 45.)  Plaintiffs thereafter filed a sur-reply with leave of the court. (Docs. 48-49.)  The matter is thus fully briefed and ripe for resolution.

## II.    <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

---

[5]    Defendant also argues that Plaintiff's claims cannot succeed under a *respondeat superior* theory, but there is no real dispute on that point, so the court's discussion on the matter will be brief.

A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law and is "genuine" only if there is a sufficient evidentiary basis for a reasonable fact finder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

III.   **DISCUSSION**

a. **Plaintiffs Have Submitted Sufficient Evidence to Create a Genuine Issue of Material Fact Concerning All Elements Necessary for Their Title VII and Section 1983 Discrimination Claims.[6]**

"Title VII makes it an unlawful employment practice for an employer to discriminate against an individual because of such individual's race, color, religion, sex, or national origin." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and ellipses omitted) (citing 42 U.S.C. § 2000e-2(a)(1)). "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* (internal quotations omitted) (citing 42 U.S.C. § 2000e-2(m)). Title VII is designed to address "discriminatory conduct" that is "so severe or pervasive that it

---

6     Because Title VII and PHRA claims follow essentially the same elements, the court will analyze them together.

created a work environment abusive to employees because of their race, gender, religion, or national origins." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

In order to prevail on a claim for hostile work environment claim,

> the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability. The first four elements establish a hostile work environment, and the fifth element determines employer liability.

*Mandel*, 706 F.3d at 167 (internal citations omitted).

Regarding the first element, the court finds that a reasonable juror could infer from the circumstantial and direct evidence in the record that Plaintiffs were intentionally discriminated against because of their race. Both Plaintiffs testified to overt discriminatory conduct and remarks by their supervisors and coworkers, including that Mrs. Chambers was referred to as a "nigger" by her supervisor and an "angry black woman" by coworkers, that her supervisor sought to discipline Mrs. Chambers based on her race, and that her coworkers made discriminatory jokes about fried chicken and watermelon in her bag. Mr. DeShields similarly testified that coworkers made several profoundly discriminatory remarks about non-white people in his presence. Plaintiffs' testimony regarding the discriminatory remarks and conduct provides a reasonable foundation for a jury to infer that other abusive

conduct Mrs. Chambers and Mr. DeShields faced in their jobs—including being degraded, yelled at, having their personal things searched, being threatened with termination, and ultimately being terminated—was all at least partly motivated by race discrimination. *See Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266-67 (3d Cir. 2021) ("Even circumstantial-evidence cases do not always require an age gap or direct replacement. The plaintiff can instead allege actions by an employer that, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.") (internal quotations omitted). Thus, the record contains sufficient evidence to create a genuine issue of material fact concerning the first element.

Turning to the remaining elements, the record creates a genuine issue of material fact regarding whether the treatment faced by Plaintiffs was sufficiently severe and pervasive such that a reasonable person in like circumstances would be detrimentally affected. A reasonable factfinder could conclude from Plaintiffs' testimony that they suffered from "severe" discrimination. Even if the occasional epithet and racist comment is not enough to give rise to a discrimination claim, the remarks alleged by Plaintiffs are particularly reprehensible, and in turn support a reasonable inference that the other various treatment suffered by Plaintiffs was based on discrimination. Plaintiffs have also testified to the pervasiveness of their abuse, often relying on objective, logical explanations to support their belief that their

treatment was motivated by racial animus. Thus, the record creates a genuine issue of material fact as to whether Plaintiffs' treatment was sufficiently severe and pervasive for a Title VII claim.

Defendant relies on three prior decisions by this court to support its argument that the conduct at issue was insufficiently severe or pervasive, only one of which is arguably relevant to the facts at hand.[7] In *Martin v. Allegheny Airlines, Incorporated*, this court granted summary judgment and dismissed a hostile work environment claim because the comments faced by the plaintiff did not rise to the level of actionable hostility and abusive behavior.  126 F. Supp. 2d 809, 819-21 (M.D. Pa. 2000).  The *Martin* Plaintiff relied on the following examples of discriminatory conduct:

> comments by a co-employee . . . that Martin and a co-worker with a disability, were the reason "why we have to go all the way down to the other end of the building now to use the bathroom" to conduct drug-testing, and second, referring to Martin, "oh, there's the real image of excellence;" after learning of Martin's diagnosis, Tucci, did not ask for assistance from Martin as often and tried to avoid eye contact or converse with Martin as often; Strohm was not as friendly and did not go to the Accounts Payable Office as often; a statement by Strohm toward

---

[7]     *Burton v. Pennsylvania State Police* is distinguishable because its disposition ultimately "turn[ed] on Plaintiff's failure to acknowledge that his employer had a legitimate prerogative to curb his admitted continued excessive socialization in the workplace," which is not the issue before the court.  990 F.Supp. 2d 478, 486 (M.D. Pa. 2014). Similarly, *Dart v. County of Lebanon* is distinguishable because the plaintiff in that case did "not allege[] disparate treatment but only failure to accommodate"—a distinct legal theory that is also not before the court. No. 13-CV-02930, 2014 WL 4792135, at *8 (M.D. Pa. Sept. 23, 2014).

> Martin, after Kreider received the promotion Martin
> desired, that if Martin did not cooperate with Kreider, she
> would be on the "outside looking in;" and Strohm asking
> about Martin's medical problems which Martin interpreted
> as insincere.

*Id.* at 820.  These comments were, in the aggregate, passive aggressive, sporadic, and had very little to do with the plaintiff's disability.  While socially unacceptable, they did not rise to the level of actionable discrimination.  In contrast, both Plaintiffs in this case testified to overt discriminatory conduct and remarks that are more abusive and direct than the allegations at issue in *Martin*.

Turning to the final Title VII element, YCP's status as a municipal entity means it cannot be held liable under a *respondeat superior* theory.  *See Leslie v. United States*, No. 3:10-cv-1005, 2011 WL 13196558, at *6 (M.D. Pa. Dec. 9, 2011).  Instead, YCP can only be liable for a Title VII violation if Plaintiffs' Section 1983 claim survives summary judgment.  *See id.*  Because this renders the two claims inseparable, the court will now turn to Plaintiffs' Section 1983 claims.

Under 42 U.S.C. § 1983, a party may bring a private cause of action against any person who, under color of law, violates "any rights, privileges, or immunities secured by the Constitution and laws."  The term "color of law" means the "misuse of power made possible because the wrongdoer is clothed with the authority of the state."  *Color of Law*, <u>Black's Law Dictionary</u> (11th ed. 2019).  To hold YCP accountable for a hostile work environment, Plaintiffs must show that the

environment arose from the execution of a policy or custom held by Defendant.  *See Leslie*, 2011 WL 13196558 at *6.

There are three ways a Section 1983 plaintiff can show they suffered discrimination attributable to a custom or policy.  First, a decisionmaker possessing final authority may promulgate "a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy."  *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotations omitted).  Second, "where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself," the municipality may be held liable.  *Id.* at 584 (internal quotations omitted).  Third, "a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the [plaintiff's] need."  *Id.* (internal quotations and brackets omitted).  If the unconstitutional practice is sufficiently "pervasive," it can be "attributed to the municipality, without identifying a particular policymaker responsible for acquiescing in the practice."  *Hailey v. City of Camden*, 631 F. Supp. 2d 528, 542 (D.N.J. 2009) (citing *Natale*, 318 F.3d at 584; *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).

Here, Plaintiffs have raised a genuine issue of material fact as to whether YCP has a custom of discriminatory practices. Both Plaintiffs testified that they regularly raised complaints with higher ups—some of which reached all the way to the Warden. There is no dispute that the Warden appears to be a policymaker at YCP with final authority, and Plaintiffs regular complaints were accordingly sufficient to put a YCP policymaker on actual notice of discrimination within YCP. Plaintiffs have also shown evidence to support that the warden took insufficient actions to handle these matters, and that on some occasions, colleagues bragged about facing no discipline for their actions. This evidence in turn could support a reasonable inference that policymakers did not engage in reasonable, corrective efforts to address a systemic problem of discrimination at YCP. *See McDonnell Douglas Corp. v Green*, 411 U.S. 792, 801 (1973) ("[I]t is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise.").

Defendant argues, in large part, that Plaintiffs' claims fail because the prison took several corrective actions with respect to discriminatory conduct. The court agrees that some of Plaintiffs' complaints were adequately addressed—such as the racist Facebook comments and a confederate flag being removed—but a reasonable factfinder could conclude that these partial efforts do not ameliorate YCP from liability stemming from a broader culture of pervasive discrimination. *See Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (holding a municipality

could be liable under § 1983 if it "failed to take precautions against future violations, and that its failure, at least in part, led to [the plaintiff's] injury") (internal quotations and brackets omitted).

Finally, Defendant's argument that some of the behavior by Plaintiffs' coworkers was not overtly discriminatory does not foreclose a reasonable jury from finding that it was motivated by racial animus. In the courts view, this is a "quintessential factual issue" that should be reserved for the jury. *See Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 761 (3d Cir. 2019) (internal quotations omitted); *Estate of Bailey by Oare v. York Cnty.*, 768 F.2d 503, 511 (3d Cir. 1985), *abrogated on other grounds*, *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189 (1989). In sum, Plaintiffs have presented sufficient evidence for their Title VII and Section 1983 claims to survive summary judgment.

### b. Mrs. Chambers Has Introduced Sufficient Evidence to Raise a Genuine Issue of Material Fact Concerning Her Retaliation Claim.

To state a claim for retaliation under Title VII, the plaintiff must show that their employer took an adverse employment action against them that was causally connected to the employee engaging in activity protected by Title VII. *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006). Retaliatory animus can be inferred from temporal proximity between the exercise of one's rights and an adverse employment decision. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-80

(3d Cir. 2000).  "[C]ircumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to [an] inference" of retaliatory animus. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (quoting *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993)).  "Although creating or permitting a hostile work environment can constitute a materially adverse employment action, vicarious liability remains necessary to establish this basis." *Peace-Wickham v. Walls*, 409 F. App'x 512, 522 (3d Cir. 2010).  To show vicarious liability, the plaintiff must show their employer "acted in an intentionally ineffective or negligently indifferent manner" after discovering the antagonistic conduct.  *Id.* at 523.

Here, at the motion to dismiss stage, the only retaliation claim the court permitted to go forward was Mrs. Chambers' claim that complaints she filed— including her EEOC complaint and this lawsuit—triggered an escalation in abusive behavior by her coworkers and supervisors.  (*See* Doc. 28, p. 17 of 20.)  A review of the record suggests she has adduced sufficient evidence to create a genuine fact issue on this allegation.  Mrs. Chambers has presented sufficient evidence from which a jury could find that she was subjected to a hostile work environment, for the reasons described above, and a review of the record suggests that her filing of complaints resulted in even worse treatment.  According to Mrs. Chambers, one officer implied that Mrs. Chambers could be punished for filing complaints about discrimination,

and the temporal proximity between her complaints and the treatment she suffered from is sufficient to create a reasonable inference that her protected activities precipitated her poor treatment.

Defendant also argues that Mrs. Chambers has not suffered an adverse employment action, but Mrs. Chambers has two independent bases for an adverse employment action, a hostile work environment and a wrongful termination claim, and as discussed above, she has adduced sufficient evidence to support the former. With respect to Mrs. Chambers' wrongful termination claim, such claims "analyze wrongful termination claims using the *McDonell Douglas* burden-shifting framework." *In re Tribune Media Co.*, 902 F.3d 384, 401 (3d Cir. 2018). This involves a three-step process. First, the plaintiff must introduce enough evidence to establish a *prima facie* case of discrimination. *Id.* Second, the burden then shifts to the employer to show there was a non-discriminatory basis for terminating the plaintiff. *Id.* Third, the burden then shifts back to the plaintiff to show such a basis is an invalid pretext for discrimination. *Id.*

To begin, Mrs. Chambers has made a *prima facie* showing of race-based intent to terminate her. Plaintiff has satisfied her general burden of creating a fact issue as to whether she was subjected to a work culture saturated with racial discrimination. She also has introduced sufficient evidence to create a fact issue as to whether the warden at least implicitly condoned a discriminatory culture and whether her

superiors treated her worse after she complained about discrimination. The burden therefore shifts to Defendant to articulate a non-discriminatory reason for terminating her.

Defendant claims that YCP validly terminated Mrs. Chambers because she did not show up to work for ten days but cites no evidence to support this theory. Assuming it had, Mrs. Chambers has carried her burden of creating a fact issue as to whether YCP's reason is pretext. Mrs. Chambers testified by affidavit that the prison's accounting of her absences is incorrect and that it claimed to offer her an accommodation that it did not. Mrs. Chambers also testified that there is a temporal mismatch in the letter—specifically, that the termination letter claimed she refused an accommodation, but Warden Doll's signature was dated before YCP claims to have made the accommodation offer, rendering the letter's explanation questionable at best. Thus, a reasonable factfinder could find the prison's offered termination basis was pretext, allowing Mrs. Chambers wrongful termination claim to survive summary judgment. Mrs. Chambers has thus submitted sufficient evidence to create a fact issue on her wrongful termination claim.

Defendant also argues that Mrs. Chambers failed to exhaust her administrative remedies by filing a new EEOC complaint about her wrongful termination, but the Third Circuit has expressly rejected the argument that a hostile work environment plaintiff must always file a new EEOC complaint if they are terminated during an

employment discrimination lawsuit. *Waiters v. Parsons*, 729 F.2d 233, 237-38 (3d Cir. 1984).

Finally, Defendant's argument that Mrs. Chambers' claim fails because she has not shown a similarly situated person outside her protected class is not persuasive because no comparator is necessarily required for a discrimination claim to move forward. *See Ezold*, 983 F.2d at 523; *cf. Martinez*, 986 F.3d at 266-67. The case relied upon by Defendant is distinguishable because it involved a plaintiff that chose to rely exclusively on a comparator theory. *See Alcantara v. Aerotek, Incorporated*, 765 F. App'x 692, 698 (3d Cir. 2019) ("Alcantara's assertion that she was treated more harshly than other employees who violated security protocols and that such treatment shows pretext fails because she had identified no comparators."). Here, by contrast, Mrs. Chambers has demonstrated fact issues as to whether YCP had a custom of discrimination toward non-white employees; whether the accusations YCP made against Mrs. Chambers in her termination letter are false; and whether the falsity of these accusations demonstrates pretext. As such, YCP is not entitled to summary judgment on Ms. Chambers' wrongful termination claim.

## IV.    **CONCLUSION**

For the reasons outlined above, Defendant's Motion for Summary Judgment

will be denied.  An appropriate order will follow.

<div style="margin-left: 50%;">
s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge
</div>

Dated: March 31, 2021